UNITED STATES of America

v.

Orlen Vick **PROFFITT.**

No. 2:93–00014.

United States District Court,
M.D. Tennessee,
Northeastern Division.

Jan. 14, 1994.

Harold B. McDonough, Asst. U.S. Atty., Nashville, TN, for plaintiff.

Mariah A. Wooten, Deputy Federal Public Defender, Nashville, TN, for defendant.

***MEMORANDUM***

MORTON, Senior District Judge.

The defendant in this case has previously been convicted of receiving stolen property and is now charged in an eleven count indictment of possessing stolen vehicles and parts with VIN removed, being a felon in possession of various weapons including a machine gun, and possessing a firearm with an altered serial number. He moved to suppress these items on the grounds that they were seized following an illegal warrantless search. The court held an evidentiary hearing on 29 November 1993. For the reasons explained below, the motion to suppress will be granted.

## I. FACTS

Orlen Vick Proffitt lives at the end of a long private driveway which dead-ends at his residence and place of business. He owns East End Equipment, a business licensed by the State of Tennessee to sell used automobiles. Part of his business consists of repairs using used parts from wrecked and allegedly stolen vehicles. Proffitt works out of two buildings located next to his house. Immediately adjacent to his house is a garage shop and behind that, a metal frame building. The driveway splits just before arriving at the house. One drive extends to the house; the other leads to the garage shop and beyond it along the side farthest from the house to the metal frame building. Along this part of the driveway, near the edge of the woods, Proffitt had strewn various vehicle components. Several vehicles were

parked along the drive and between the garage shop and metal frame building. None of the salvage material was visible from the paved road, although much of it was visible during the approach along the driveway. Officer Calahan was not sure that the vehicles were visible from the main road; he did testify that he did not see them until they approached the house on the driveway.

At about 10:00 A.M. on 11 June 1992, Investigators Calahan and McGaughy of the Tennessee Highway Patrol Criminal Investigation Division and Troopers Smith and Hester went to Proffitt's residence and place of business. They were there to conduct a regulatory inspection and audit of his used car dealership, East End Equipment, pursuant to Tenn.Code Ann. § 55–5–108.[1] Although that section does not specifically apply to used car dealerships, it does apply to those who are in the business of buying or selling used car parts. When the officers arrived, Proffitt demanded to see a warrant. The officers explained that their business was to be done under the authority of the statute and did not require a warrant, but Proffitt vehemently refused to let them conduct their inspection. This discussion occurred at the corner of the garage shop nearest the house.

At one point, Smith walked away to smoke a cigarette, and Proffitt called after him not to wander around. Proffitt continued to insist that they had no authority to search and that they must leave and return only with a warrant. As the discussion heated, Investigator McGaughy became frustrated and, as she testified, took a walk to cool off. She walked over to a truck parked between the garage and metal frame building, looked inside, and noticed that the steering column had been "peeled." This aroused her suspicion because it typically indicates that the vehicle has been stolen. She noted the VIN, called it in over the radio, and determined that the truck had been stolen. Subsequently, the officers obtained a search warrant and conducted a search of all the premises, locating weapons and other stolen vehicles and parts.

At the evidentiary hearing, Calahan testified that he had for some time been considering an audit and inspection of Proffitt's business, but that what prompted his decision was information that Proffitt had sold a stolen vehicle a year earlier. He testified that he wanted to discuss this matter "and at the same time" conduct an inspection. The court finds that in fact the statutory inspection was a pretext to search, since the information he had was stale and would not support a warrant.

Section 55–5–108 provides, in part:

(a)(1) Any person, firm, or corporation engaged in the business of buying or selling of used automobile parts shall keep permanent records of transactions of buying or selling [such parts].... Such record shall include from whom the item was purchased and such seller's address and driver license number and to whom the item was sold and such purchaser's address and driver license number, as well as the description of the item and any identifying number or numbers. Such records shall be required to be kept for a period of three (3) years from the date of the transaction and shall be available to all law enforcement officers for inspection at any reasonable time during business hours without prior notice or the necessity of obtaining a search warrant.

(2) Any person, firm or corporation required to keep records by §§ 55–5–106—55–5–110 and willfully failing to do so commits a Class C misdemeanor.

(3) For the purpose of locating stolen vehicles, establishing lawful ownership, possession, titling or registration, any motor vehicle investigator designated by the commissioner of revenue, except as provided in subdivision (a)(4), may inspect any vehicle, whether intact, wrecked, or dismantled, at an automobile dismantler's lot, salvage lot or other similar establishment required to keep records under subdivision (a)(1), within the state of Tennessee.

(4) Inspection conducted pursuant to subdivision (a)(1), (2) or (3) shall be con-

1. This section regulates the purchase and sale of used auto parts. Proffitt's license pertained only to the used car business, but § 55–5–108 does not require a license.

ducted during normal business hours and at a time and in a manner so as to minimize any interference with or delay of business operations.

In sum, subdivision (a)(1) requires certain persons to keep records and allows law enforcement officers to enforce the requirement by inspecting the records. This subdivision provides that the records may be inspected without prior notice and without the necessity of obtaining a search warrant. Curiously, it does not by its terms allow an inventory reconciliation with the records, although it is necessarily implied if the regulatory scheme is to have any effect. Subdivision (2) provides penalties for the failure to keep records as required. Subdivision (3) allows certain investigators to conduct searches for the purposes of locating stolen vehicles or establishing indicators of lawful possession. It does not mention notice or that a warrant is not required.[2] Subdivision (4) requires that any inspection under subdivision (a) be conducted during normal business hours and so as not unduly to interfere with or delay business operations.

## II.  DISCUSSION

■ "Time and again, this Court has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson,* — U.S. —, —, 113 S.Ct. 2130, 2135, 124 L.Ed.2d 334, 343 (1993) (internal quotes omitted). One such exception exists with respect to "administrative inspections designed to enforce regulatory statutes" governing the operation of " 'closely regulated' industries." *New York v. Burger,* 482 U.S. 691, 700, 107 S.Ct. 2636, 700, 96 L.Ed.2d 601 (1987). The rationale for this exception lies in the reduced privacy interests of the owner or operator of commercial premises in a closely regulated in-

dustry. *Id.* at 702, 107 S.Ct. at 2643. In light of the holding in *Burger* and the fact that the defendant does not even address the point, it requires no discussion to hold that the used auto parts business is a closely regulated industry.

■ However, even in this context, a warrantless inspection must meet three criteria. First, "there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made." *Id.* Although here the government did not argue the state's interests, the court notes the following language in *Burger:*

> [T]he State [of New York] has a substantial interest in regulating the vehicle-dismantling and automobile-junkyard industry because motor vehicle theft has increased in the State and because the problem of theft is associated with this industry. In this day, automobile theft has become a significant social problem, placing enormous economic and personal burdens upon the citizens of different States. *Id.* at 708, 107 S.Ct. at 2646–47.

This court finds that Tennessee also has a substantial interest in regulating the used auto parts business and that the regulatory scheme it has established reasonably serves this interest. The scheme requires persons engaged in this business to keep records of all transactions and imposes penalties on those who fail to do so properly. Since stolen parts do not come with such records, an attempt to reconcile the inventory to the records would be unsuccessful, which immediately subjects the operator to penalties for failing to keep proper records. In addition, an unsuccessful inventory reconciliation might in some cases amount to probable cause to obtain a warrant to search for stolen parts. In any event, were the auditors to discover parts whose identification numbers were defaced or altered, they could immediately impound them.[3] By effectively deter-

---

**2.**  The United States District Court for the Eastern District of Tennessee has specifically held that searches conducted pursuant to subdivision (3) require a search warrant. *See* Magistrate's Report and Recommendation at 14 in *United States v. Branson,* No. 3–32–134 (E.D. Tenn. Mar.

10, 1993) (order adopting Magistrate's Report and Recommendation) *appeal pending.*

**3.**  Tenn. Code Ann. § 55–5–108(b)(1). If such property is discovered during a lawful records inspection, its warrantless seizure falls under the

ring the business of buying or selling stolen auto parts, the regulatory scheme established in § 55–5–108(a)(1) reasonably serves the state's substantial interest in regulating the used auto parts industry.

Second, "the warrantless inspections must be necessary to further the regulatory scheme." *Burger*, 482 U.S. at 702, 107 S.Ct. at 2644 (internal quotes and brackets omitted). Here the statute encounters its first difficulty. Certainly, warrantless inspections to match records to inventory are necessary to enforce the records requirement. As the Supreme Court explained in *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972):

> [I]f inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility as to time, scope, and frequency is to be preserved, the protections afforded by a warrant would be negligible. *Id.* at 316, 92 S.Ct. at 1596.

Therefore, to the extent that § 55–5–108 allows the investigators to inspect records (and by implication to audit the inventory) without a warrant, it necessarily serves the purpose of the regulatory scheme. *See* § 55–5–108(a)(1). But to the extent that it allows a warrantless search "[f]or the purpose of locating stolen vehicles" or any stolen parts, or to "establish[ ] lawful ownership,

possession, titling, or registration," the statute fails this prong of the *Burger* test. Such a search is not necessary to enforce the regulatory scheme.[4] *See* § 55–5–108(a)(3). Certainly it serves the purpose of locating stolen vehicles and stolen vehicle parts, but that is not the test. The question is whether the *regulatory scheme* accomplishes this result and whether the particular warrantless search is necessary to carry it out.

It is the regulatory scheme itself which provides the deterrent effect by making it difficult both to comply with the regulation—by keeping records—*and* to engage in the conduct the regulation seeks to deter—purchasing or selling stolen parts. And all the administrative search exception allows is the enforcement of the *regulatory scheme*.[5] Therefore, any warrantless inspections carried out under § 55–5–108(a)(3) must fail the *Burger* test.

The third criterion for a proper warrantless inspection is that "the statute's inspection program, in terms or the certainty and regularity of its application, [must] provide[e] a constitutionally adequate substitute for a warrant." *Burger*, 482 U.S. at 703, 107 S.Ct. at 2644. In explaining this requirement, the Court stated:

> [T]he regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined

---

plain view doctrine—the officers would be lawfully positioned and the criminality of the parts would be immediately apparent.

**4.** If, as the *Branson* court held, a subsection (3) search *does* require a warrant, then the agents in this case exceeded their authority.

**5.** This attribute of the administrative search exception assumes critical importance in cases, such as this one, in which the statute regulates an activity which is itself the subject of penal sanctions. This statute sets up a regulatory scheme whose purpose it is to deter the illegal business of dealing in stolen parts. It is unlike an administrative regulation whose purpose is to affirmatively produce some result or encourage some conduct that is unrelated to criminal activity. Mine safety and OSHA regulations are of the latter sort. Thus, a legislature may constitutionally establish a regulatory scheme whose purpose it is to deter some undesirable result—such as unsafe mines—and then enforce that scheme by

warrantless inspections to determine compliance with the safety regulations. Or it might establish a regulatory scheme whose purpose it is to deter an illegal business and then enforce that scheme by warrantless inspections to determine compliance with, say, a recordkeeping requirement. But it may not constitutionally enforce the regulation by the indirect means of warrantless searches whose purpose is to detect evidence of the crimes the regulation seeks to deter. This would simply short-cut the warrant requirement.

If courts were blind to the distinction between the kinds of activity regulated, legislatures could defeat the warrants requirement simply by characterizing a search as administrative when its purpose in fact is to uncover evidence of criminal activity. That is exactly what happened here. Incredibly, the Tennessee Legislature was explicit about it, providing for a search "for the purpose of locating stolen vehicles."

scope, and it must limit the discretion of the inspecting officers. *Id.*

Section 55–5–108 fails this prong of the test as well, as it leaves too much to the discretion of the inspectors. The Tennessee statute gives no indication of whether a business will be inspected other than to require those engaged in the business of buying or selling used auto parts to keep records and make them available for inspection at any reasonable business hour. It provides no indication of the method by which inspectors are to select businesses for inspection, and in fact does nothing to inform an operator whether he is "engaged in the business or buying or selling used automobile parts" for the purposes of the records requirement. That determination is left completely to the discretion of the investigator who decides whether to conduct the search.[6] Moreover, just as subdivision (a)(3) fails the second prong because a search "for the purpose of locating stolen vehicles" does not serve the purpose of the regulatory scheme, so also does that language fail the third prong because it extends the scope of the search too broadly. It does nothing to limit the inspector's discretion in the search. The court concludes that the statute as applied to the search in this case failed to fall within the narrowly defined exception for warrantless administrative searches, but there remains the question whether the "extreme sanction" of suppression is justified. *United States v. Leon,* 468 U.S. 897, 917, 104 S.Ct. 3405, 3417–18, 82 L.Ed.2d 677 (1984).

In *Illinois v. Krull,* 480 US 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), the Supreme Court extended the *Leon* good faith exception to the exclusionary rule to encompass warrantless administrative inspections conducted pursuant to a statute later held to be unconstitutional. The Court held that where the inspectors relied in good faith upon the statute, there would be no sense in applying the exclusionary rule because it would do nothing to deter unlawful official conduct, and only little to deter legislators from enacting such statutes. Concluding that the officer relied in objective good faith upon the statute that appeared legitimately to allow a warrantless administrative search of a wrecking yard, the Court refused to suppress the evidence in that case.

*Krull* can have no application here. It is objectively unreasonable for an officer to use an administrative statute to conduct a warrantless search "for the purpose of locating stolen vehicles." It is, in fact, a pretext. As investigator Calahan himself testified, the impetus for the search in this particular case was that he received information that pointed to Proffitt's culpability. Moreover, subdivision (3) is exactly the kind of pretextual statute disapproved in *Burger,* 482 U.S. at 717 n. 27, 107 S.Ct. at 2651 n. 27. To the extent the statute authorizes such a warrantless search, it is unconstitutional. To the extent an officer might rely upon it, it is objectively unreasonable to do so since it is pretextual. Finally, exclusion will properly serve the purpose of deterring pretextual searches.

The government also argues that even if neither the administrative search exception nor the good faith exception applies, the evidence was nonetheless properly seized under the plain view doctrine, or alternatively, the open fields doctrine.

As to the plain view argument. To seize evidence found in plain view, the officers must justifiably be where they are when they seize evidence whose criminality is immediately apparent. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The court has already held that the warrantless search at issue here does not properly fall within the exception for administrative searches; therefore,

---

**6.** A licensing requirement would cure this defect. The licensing process would give the State an opportunity to inform the operator of the obligation to ·submit to inspection. Although the ambiguity in defining those "engaged in the business of buying or selling used automobile parts" would remain for the purpose of deciding who must obtain a license, the only consequence

there is a fine, cessation of business, or some such penalty. With a licensing requirement, the consequence of the exercise of discretion is merely whether someone is required to be licensed. By contrast, the effect of the current statute is that it leaves to the discretion of the investigator the question of whom to search.

the officers were not lawfully situated. They were there in order to locate stolen vehicles, but had no warrant. Proffitt repeatedly told them not to wander around, but they did so anyway. Even if the business was normally open to the public, though the court does not so find, as to those officers Proffitt had revoked permission to walk around the buildings. Furthermore, there was nothing immediately apparently criminal about the truck until McGaughy saw the steering column, which she could not do without unlawfully wandering around the building to look through the truck window. From where they were lawfully situated, the officers testified that they thought it was odd that the truck appeared so new and shiny and that it had Georgia plates, but the government did not argue, and this court would not hold, that this alone constitutes the appearance of criminality.

■ Nor does the open fields doctrine apply. Again, their presence was the result of a pretextual application of the administrative search statute, so that they were not lawfully situated with respect to the defendant's property when they observed the peeled steering column. In *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), the Supreme Court recognized that "the businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property." *Id.* at 543, 87 S.Ct. at 1739. The truck was located within the confines of Proffitt's business property, and certainly within the business's analog of a home's curtilage. It would be ludicrous to allow the government to claim the benefit of the open fields doctrine under these circumstances.

### III. CONCLUSION

The court concludes that § 55–5–108(a)(3) unconstitutionally authorizes searches for the purpose of discovering penal violations unrelated to the enforcement of the regulatory scheme. In effect, it dispenses with the necessity of a search warrant under the guise of an administrative inspection. In any event, the investigators in this particular case used § 55–5–108 as a pretext to conduct a search for which they could not legitimately have obtained a warrant. The information they obtained was then used for a search warrant, which tainted all further evidence discovered in this case. Accordingly, the defendant's motion to suppress will be granted.